# United States District Court
## Western District of Virginia
### Harrisonburg Division

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| **ANGELA K. MARTIN,** | ) | Civil No.: 5:12cv00066 |
| | ) | |
| *Plaintiff,* | ) | |
| **v.** | ) | **REPORT AND** |
| | ) | **RECOMENDATION** |
| **CAROLYN W. COLVIN,**[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | By:  Hon. James G. Welsh |
| *Defendant* | ) | U. S. Magistrate Judge |
| _____ | ) | |

Angela K. Martin brings this civil action challenging a final decision of the Commissioner of the Social Security Administration ("the agency") denying her application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§ 416(i) and 423.  Jurisdiction of the court is pursuant to 42 U.S.C. § 405(g).

On January 12, 2010, the plaintiff filed her claim for DIB alleging a period of disability starting on March 10, 2008. (R. 13, 47, 95-96). It was denied initially (R. 50–59), on reconsideration (R. 58–60, 168-177), and after an administrative hearing (R. 10-26).  With Appeals Council denial of her review request (R.1–5), the unfavorable decision of the

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013; pursuant to Rule 25(d), Fed. R. Civ. P., she is substituted for Michael J. Astrue as the defendant in this suit.  No action is needed to continue it by reason of the last sentence of 42 U.S.C. § 405(g).

administrative law judge ("ALJ") now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

Along with her Answer (docket #9) to the plaintiff's Complaint (docket #3), the Commissioner has filed a certified copy of the Administrative Record (docket #10), which includes the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision. The parties have filed motions for summary judgment with supporting memoranda; oral argument was conducted by telephone on those motions on February 25, 2013. (docket no. 18). By standing order this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    Standard of Review

The court's review in this case is limited to determining whether the factual findings of the Commissioner are supported by substantial evidence and whether they were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2[d] 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2[d] 640, 642 (4th Cir. 1966). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays v. Sullivan*, 907 F.2[d] 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2[d] at 642). The court is "not at liberty to re-weigh the evidence

… or substitute [its] judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3[d] 650, 653 (4th Cir. 2005) (internal quotation marks omitted).

## II.     The ALJ's Decision

The ALJ issued his written decision on July 29, 2011. (R. 13-23).  Therein, he found that Martin did not engage in any substantial gainful activity between her alleged onset date of March 10, 2008 and her date last insured (June 30, 2009) and that her severe [2] impairments included "status post-myocardial infarction, ischemic heart disease, and stage III kidney disease." (R. 15). Based on his review of the record, including both the medical record and her testimony, he further concluded that Martin's depression, history of bilateral carpal tunnel syndrome, and status post-thyroidectomy in June 2008 were non-severe conditions about which she alleged no treatment or limitations, physical or otherwise, and which, alone or in combination, had no more than minimal effect on her functional capacities for the twelve-month durational requirement of the regulations. [3]  (R. 15-16).

---

[2]   A *severe* impairment is any impairment or combination of impairments which significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. 404.1520(c).

[3]   *See* Social Security Ruling ("SSR") 82-52.

After considering *inter alia* Martin's cardiac condition under Listing [4] 4.00, her kidney disease under Listing 6.02 and her mental health issues pursuant to Listing 12.00, at the third sequential step in the agency's decision-making process, the ALJ found that Martin's impairments, both individually and in combination, fell short of listing-level severity. (R. 16-17). Based on his further assessment of Martin's residual functional capacity, the ALJ concluded that during the decisionally relevant period she retained the capacity to perform light work which required no more than occasional climbing, including her past relevant jobs as a cleaner, companion, and service station cashier. (R. 17-23). In the alternative, he found that Martin could perform other light, unskilled jobs available in significant numbers in the national economy, including the work as a laundry separator, stock checker, and packing machine operator. (R. 22–23).

In in reaching these conclusions, the ALJ outlined and considered Martin's medical history in detail; he determined that the degree of symptom severity claimed by Martin "lack[ed] support and consistency with the other evidence of record" (R. 20); he characterized her post-heart attack treatment as "limited and conservative" (*Id.*); he noted that most of her pain during the period in question was medically determined to be musculoskeletal, not cardiovascular, in origin, and he gave "significant weight" to Dr. Snodgrass' July 27, 2009 determination that Martin could return to work without limitation. (R. 20-21).

---

[4]   The Listing of Impairments ("the listings") is in appendix 1 of subpart P of part 404 of 20 C.F.R. It describes for each of the major body systems impairments that the agency considers to be severe enough to prevent an individual from doing any gainful activity, regardless of age, education, or work experience.  20 C.F.R. § 404.1525.

### III.	Summary and Recommendation

In her brief, Martin asserts error by the ALJ on two basic grounds. First, she argues that the ALJ failed to consider adequately her testimony regarding her symptoms and functional difficulties in making his assessment of her residual functional capacity and in relying on vocational testimony given in response to, what she contends was, an incomplete hypothetical question. Second, she argues that the ALJ's determination of her credibility was not based on substantial evidence, because he predicated this finding on that which he wished to prove — the circular reasoning fallacy of *petition principii*.

Based on a thorough review of the administrative record and for the reasons herein set forth, it is **RECOMMENDED** that the plaintiff's motion for summary judgment be **DENIED**, the Commissioner's motion for summary judgment be **GRANTED**, an appropriate final judgment be entered **AFFIRMING** the Commissioner's decision denying benefits, and this matter **DISMISSED** from the court's active docket.

This recommended result is not intended to suggest that the plaintiff does not have significant health problems, along with pain and attendant functional difficulties. The ALJ, however, specifically assessed each of her health issues and associated limitations in accordance with his decisional responsibilities. Therefore, the court is constrained to conclude that the Commissioner's final decision is supported by substantial evidence.

### IV.	The Administrative Record

*Medical History during the Decisionally Relevant Period*

On March 9, 2008, Martin visited the Augusta Medical Center ("AMC") emergency room with complaints of chest discomfort. (R. 332). The attending physician there believed that the pain was non-cardiac in origin, but he nevertheless transferred Martin to University of Virginia Medical Center ("UVaMC"). (R. 332–333), where doctors diagnosed her as having sustained a non-ST elevated myocardial infarction (NSTEMI); a stent was inserted for a mid-right coronary artery lesion, and Plavix, aspirin and a heart-healthy diet were prescribed. (R. 254–257).

Less than one week later Martin returned to the AMC emergency room with complaints of chest pain. (R. 335–36). On this occasion the attending physician assessed her pain as either of musculoskeletal origin or "maybe a mild pericarditis." (R. 336). He prescribed Naprosyn, Vicodin, and restarted her on Celexa. (R. 336).

On April 21, 2008, Martin once again visited the emergency room ("ER"). On this occasion it was for treatment of rib injuries resulting from a slip and fall in her bathtub. (R. 337–38). The ER physician prescribed an opioid pain reliever (Vicodin) and instructed her to use ice regularly and take the prescribed anti-inflammatory medication. (R. 337).

In mid-May the plaintiff saw Shelly Snodgrass, MD, her primary physician. (R. 428–430). At that time she complained of having periodic chest pain ever since the stent had been installed and that this condition worsened after she tried to help with her sister's cleaning

business. (R. 428-429). In addition, she complained of occasional dizziness and reported that her depression had been under control since re-starting Celexa. (R. 428). Dr. Snodgrass noted in her office record that she suspected the plaintiff's chest pain was related to her unstable angina; she started the plaintiff on a low-dose beta-blocker (atenolol); she instructed the plaintiff to avoid anti-inflammatories; she continued the use of Celexa (an antidepressant) at the same dosage; she noted the need to schedule an echocardiogram and carotid Doppler to evaluate further the plaintiff's complaints of "palpitations and vertigo;" she referred the plaintiff to her cardiologist (Michael Rogosta, MD) at UVaMC for follow-up heart health care, and she spent "greater than 50%" of a 70 minute appointment "counseling" the plaintiff " about the "need for ongoing evaluation and management" of her heart and related health issues. (R. 429-430).

When the plaintiff saw Dr. Rogosta on May 19, she again complained of continuing chest pain, headaches and fatigue. (R. 249-251). Another catheterization, however, revealed no significant stenosis, and she was instructed to discontinue the use of Plavix, so that she could be scheduled for a thyroidectomy, but to continue taking a baby aspirin. (R. 250, 540-542).

On May 28, Martin saw Dr. Snodgrass about chest pain, which Dr. Snodgrass concluded was either musculoskeletal in etiology or the result of gastro-esophageal reflux disease ("GERD"). (R. 425–26). Dr. Snodgrass prescribed Zantac and instructed Martin to return in a month for a follow-up. (R. 426).

Less than one month later she again sought ER treatment at AMC. On that occasion she reported moderate chest pain radiating into her back (R. 342); however, an electrocardiogram and chest X-ray were both "normal," and the ER physician ruled-out any pulmonary embolism or acute cardiopulmonary process. (R. 305, 341, 343, 470–473). Concluding that the plaintiff's pain complaint was probably of gastrointestinal origin, Prilosec was prescribed. (R. 343). Several days later (June 25, 2008), she underwent a successful total thyroidectomy and was discharged he following day. (R. 345–348).

When she saw Dr. Snodgrass on July 2, Martin reported that her atypical chest pain had subsided since being started on Prilosec by the ER physician. (R. 422). She reported that she was smoking one and one-half packs of cigarettes daily, that Wellbutrin was not helping with her efforts to quit, and that her depression was otherwise stable. (R. 422). A basic metabolic panel revealed that Martin's estimated glomular filtration rate (EGFR) was 49,[5] a level consistent with stage 3 chronic kidney disease. (R. 423, 468). Since this was Martin's second reading at this level, Dr. Snodgrass ordered a battery of preliminary baseline laboratory studies and a kidney ultrasound. (R. 423).

The July 14 kidney ultrasound revealed bilateral scarring (R. 306), and the lab test results revealed mildly elevated blood glucose level (102, as compared to the normal range of 60–100),

---

[5] The units for EGFR are mL/min/1.73 m$^2$. (R. 468).

a slightly low EGFR (54, with normal being at least 60), and a low creatinine clearance rate (50, with a normal range being between 80–115). (R. 462–467).

When the plaintiff saw Dr. Snodgrass the following day, Martin reported having no chest or heartburn symptoms and no shortness of breath or other breathing difficulty; however, she presented with a left wrist nodule, minor swelling in her extremities and a complaint of difficulty sleeping. (R. 419–420). At the time of a follow-up office visit on July 29, Dr. Snodgrass recorded that the swelling problem has resolved, that Ambien has successfully treated the plaintiff's insomnia, and that she could pursue employment and training activities without limitations. (R. 416-417, 429).

After seeking no medical treatment for the next four months, on November 21, 2008 and then in January and twice in March 2009, Martin returned to the ER with varying pain-related complaints. In November her complaint pertained to right posterior chest pain (R.350); in January her complaint pertained to anterior chest and epigastric pain (R.352), and in March 2009 her complaints pertained first to chest pain and second to a minor infection of the left ring finger (R. 354, 357). Her chest pains were diagnosed as musculoskeletal in origin, and radiographs demonstrated no acute or active cardiopulmonary disease. (R. 307, 308, 310, 350, 352-353, 357).

Although she injured her wrist in May and was treated for this transient medical problem, she did not again seek treatment for a chest-related pain complaint until June 2009. (R. 309, 357). On that occasion, the ER physician's clinical findings, the "normal" electrocardiogram

results, the X-ray results and the treadmill stress test results, all demonstrated no medically significant coronary condition requiring treatment. (R.357-365). In addition to seeking ER treatment for "neck pain" later in the same month (R. 411-414), the plaintiff was also seen at Blue Ridge Behavioral Health in late June for an initial psychological evaluation and was diagnosed to be suffering from a major depressive disorder. (R. 228-231).

After expiration of her insured status, during the Summer of 2009 the plaintiff sought ER treatment for neck pain, arm and hand pain, attendant numbness ("carpal tunnel"), a cough, an infected finger, and twice for "chest pain." (R. 369-374, 378-383, 402-409). On each occasion, her chest pain was once again diagnosed to be of musculoskeletal in origin. (R. 317, 375–377, 380 –383).

Martin's medical records additionally show, by history, that prior to the expiration of her insured status she had experienced episodes of urinary incontinence and frequent urination dating back to 2004 (R. 258–259, 265); however, she did not report any problems with either condition during the period herein at issue. (R. 20-21).

*Plaintiff's Vocational Profile and Activity Limitations*

On the date she alleges her disability began, the plaintiff was just short of forty years of age. [6] (R. 41, 107). She had an eleventh grade education [7] (R.41, 112); her past relevant work history shows that she had worked for a number of employers, and it shows that most of her past relevant work was as a housekeeper or custodian, cleaning hotels, homes, and retail establishments. (R. 38–39, 100–103, 113, 121–122). As generally performed these jobs are classified as unskilled and exertionally light. [8] (R. 41).

At the hearing, Martin testified that her back pain made it more difficult for her to drive and slowed her performance of housekeeping chores. (R. 30–31). She said that her doctors had advised her to drink a lot of fluid in order to promote her kidney health and that this caused her

---

[6]    At this age the plaintiff is classified as a "younger person," and pursuant to the agency's regulations age is generally considered not to affect seriously a younger person's ability to adjust to other work. 20 C.F.R. § 404.1563(c).

[7]    Pursuant to the agency's regulations a person with a 7th grade through the 11th grade formal education has a limited education, meaning an ability in reasoning, arithmetic and language skills, but not enough to allow an individual to do most of the complex job duties needed in semi-skilled or skilled jobs. 20 C.F.R.§ 404.15.64(b).

[8]    Using materials published by the Dept. of Labor, the agency classifies occupations as unskilled, semi-skilled, and skilled, and in making its determinations, the agency defines *unskilled work* as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, [a job is considered] unskilled if the primary work duties are handling, feeding and off-bearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 C.F.R. § 404.1568(a). To determine the exertional requirements for occupations in the national economy, jobs are classified by the agency as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567. Light work requires lifting no more than 20 poundsand frequently carrying 10 pounds, and a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b). To be considered capable of performing a full range of light work, the relevant elaboration in Social Security Ruling ("SSR") 83-10 provides that an individual must be able to stand and walk, off and on, for a total of approximately 6 hours out of an 8-hour workday.

to have to urinate frequently. (R. 32–33). As part of an April 2010 written report to the agency outlining her functional abilities and limitations, Martin indicated that her back pain limited "postural activities," that her chest pain limited her ability to lift items and climb stairs, and that her depression affected her memory and concentration, as well as her ability to care for herself. (R. 132, 136). She also indicated that her need to urinate frequently interfered with her sleep and that her incontinence caused her to have to change her panties "every 30 minutes or so," whenever she engaged in hobbies such as fishing and sports. (R. 131, 135).

*Vocational Testimony*

In addition to providing testimony concerning the plaintiff's vocational profile and work history, in response to a hypothetical question posited by the ALJ, Andrew V. Beale, Ed.D., testified that during the period at issue an individual with the plaintiff's vocational profile and limited to work at a light exertional level requiring only occasional climbing, could successfully perform Martin's past relevant jobs, as well as other light unskilled work such as a laundry separator, stock checker, and packing machine operator. (R. 41-42). In response to questions posed by Martin's attorney, Dr. Beale further testified that the unskilled light occupational base would be significantly eroded, particularly in the area of production work, if the individual required unscheduled toilet breaks at a rate significantly above the norm during a four-hour time span, "particularly if [the individual] were away from the workstation" for any significant time; however, it was also Dr. Beale's opinion that many of these jobs, such as service station cashier, companion or cleaner, would "be [in] close proximity to a bathroom" and would not erode the occupational base. (R. 43–44). Additionally, Dr, Beale opined that in the event such breaks

became detractive because of a need to change clothes, then "that would significantly cut-in on her ability to be competitively employed." (R. 44).

## V.    Analysis

### A.

Martin first argues that the ALJ mischaracterized or disregarded the vocational witness' testimony by failing to consider Dr. Beale's responses to hypothetical questions posed by her attorney.  In particular, she faults the ALJ for ignoring Dr. Beale's testimony that an individual would have to meet a competitive level of production in order to meet the demands of a cleaning job and that an individual would be similarly unemployable if she required a significant number of unscheduled toilet breaks within a four-hour period. (R. 43–44).

Although this vocational testimony was given regarding significant limitations on employability under the assumed restrictions, the ALJ was not bound to accept the restrictions assumed by plaintiff's attorney, and in the instant case the ALJ did not err in rejecting those assumed restrictions.  An ALJ has "great latitude in posing hypothetical questions [to a vocational witness] and is free to accept or reject suggested restrictions so long as there is substantial evidence to support the his ultimate question."  *See Koonce v. Apfel*, 1999 U.S. App. LEXIS 307, *15 (4th Cir. Jan. 11, 1999) (unpublished) (citing with approval *Martinez v. Heckler* 897 F.2d 771, 774 (9th Cir. 1986).

In other words, an ALJ is obligated only consider responses to hypothetical questions that adequately reflect a claimant's characteristics prior to her date last insured. *Johnson v. Barnhart*, 434 F.3<sup>d</sup> 650, 658 (4th Cir. 2005). Consistent with her attorney's hypothetical question, Martin testified that she suffered from back pain that made it difficult for her to drive and caused her to clean rooms more slowly than expected (R. 30–31); however, in connection with her many medical attention efforts during the period at issue, at no time did she complain about any functionally limiting lower back pain. During the decisionally relevant period, her persistent pain-related complaint was about "chest pain." It was only shortly before her date last insured that her pain-related complaint became "neck pain" (*see* R. 402, 404, 408, 413); it was not until November 20, 2009 that lower back pain—subjective or objective—appears in her medical record, and that entry was in a clinic note listing "back pain" as the eighth in a list of eight medical issues. (R. 245).

On this record, therefore, there was patently no error on the part of the ALJ as a result of his failure to consider vocational testimony given in response to a hypothetical question based on what was in effect an unsubstantiated assertion by the plaintiff's regarding her slow work pace. *Cf. Stanley v. Secretary of HHS*, 39 F.3<sup>d</sup> 115, 118-119 (6th Cir. 1994) (The ALJ is not required to "incorporate unsubstantiated complaints into his hypotheticals."); *Rosin v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 69574, *18-19 (EDMich. Jun 7, 2011) (no error found in the ALJ's failure to incorporate the claimant's subjective allegations of disabling back pain, where there

was "simply nothing in the record to support an argument of disabling pain" during the insured period).

Likewise, it was not error for the ALJ to fail to take into account vocational testimony pertaining to the plaintiff's testimony about functional limitations attendant to her urinary symptoms. As explained below, the evidence in the record simply fails to establish that Martin's urinary symptoms had any effect on her capacity to work between her alleged onset date and her date last insured. Thus, neither the ALJ's failure to incorporate these symptoms into his hypothetical question nor his disregard of the related vocational testimony was error. *Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005). *See also Hammond v. Apfel*, 5 Fed. Appx. 101, 105 (4thCir. 2001) (finding that an ALJ properly disregarded a vocational expert's response to a hypothetical posed by complainant's attorney). Moreover, as the vocational witness expressly observed, even if Martin needed to use the restroom multiple times in a four hour period, that would not stop her from gaining and maintaining employment as a house cleaner, a companion, or a cashier. (R. 43–44).

## B.

As her second argument on appeal, the plaintiff contends that the ALJ discredited her testimony regarding her need to urinate frequently without providing an adequate reason for doing so. Specifically, she points to the following language in the ALJ's opinion:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's and [her friend's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment. (R. 18).

As she correctly points-out, this gets things backwards. The ALJ is supposed to assess the claimant's credibility before reaching his conclusion about the claimant's residual functional capacity. *See Bjornson v. Astrue*, 671 F.3$^d$ 640, 645 (7th Cir. 2012).

Counsel for the agency conceded at argument that this language was "unfortunate," but counters that, when taken as a whole, the ALJ's opinion properly considers Martin's testimony. On this point, the agency is correct. Inclusion of what was in effect credibility boilerplate in an otherwise valid decision does not render the decision in the instant case fatally defective. *Polson v. Astrue*, 2013 U.S. App. LEXIS 1473, *5-6 (10th Cir. Jan. 23, 2013) ("The use of boilerplate language, in the absence of a more thorough analysis is insufficient to support an ALJ's credibility determination;" however, where "[the ALJ] provide[s] specific reasons for his credibility determination and … link[s] his credibility determination to the evidence, … [his determination is] supported by substantial evidence.") (internal quotation marks and citations omitted); *Richison v. Astrue*, 462 Fed.Appx. 622, 625 (7th Cir. 2012); *Racey v. Astrue*, 2013 U.S. Dist. LEXIS 19614, *19-20 (WDVa. Feb. 13, 2013).

In the instant case, the ALJ addressed Martin's testimony regarding incontinence and frequency of urination on pages 8 and 9 of his decision. Therein, he wrote:

> The medical evidence of record also does not indicate problems with frequent urination that would have significantly impaired [Martin's] ability to work, as treatment notes do not show frequent reports of this problem to physicians during the period at issue. Further, the claimant testified that she has been able to work fairly consistently after the alleged onset date of her disability, both as a cleaner and performing odds and ends. (R. 21).

Consistent with this ALJ assessment, a review of the medical record fails to reveal any complaint of incontinence or frequent urination during the period at issue. In fact, on June 29, 2009 (one day before her insured status expired), the plaintiff expressly "denie[d]" to Dr. Snodgrass that she had been experiencing any polyuria (R. 413), and it is only in a UVaMC clinic record that one finds a notation that Martin had a multi-year " history of stress incontinence." [9] (R.245).

On review, every indication in the record suggests that Martin's urinary symptoms—which date back to 2004 (R. 258, 260, 265), during the decisionally relevant period were, for the most part, under control. Although she experienced an unfortunate (and surely an embarrassing) incident in 2007, while working at a gas station, [10] as she tells it, the incident was largely the

---

[9]  On appeal, the plaintiff points to a May 3, 2010 mental status evaluation by Dr. Snodgrass listing several diagnoses, the last of which is "over active bladder/urinary incontinence." (R. 554). This entry is dated more than ten months after the plaintiff's last insured date, and its probative value is, therefore, minimal. Moreover, this entry is dated only one month after the plaintiff had "denie[d]" to her nephrologist at UVaMC that she had any "history of … frequency of urination."(R. 238).

[10]  Testifying at the hearing, Martin indicated that she worked as a cashier at the gas station for "like three months," and that this was "about five years ago" and definitely before her heart attack. (R. 38–39). Martin's Insured Status Report shows $372.94 in wages from "Valley Oil Corporation" in 2007. (R. 100).

result of her boss's refusal to let her take a bathroom break. (R. 34, 137). And as the ALJ pointed-out in his decision, she continued working after this incident and earned income in all four quarters of 2008. (R. 21, 99).

Additionally, an adequate reason by the ALJ not to credit fully the plaintiff's testimony regarding her need during the decisionally relevant period to urinate frequently is evident from the nature and timing of the third-party statements placed in the record in support of this testimony. Krista Smith, an elderly lady whom the plaintiff helped-out on a part-time basis, estimated that Martin requires at least two to three unscheduled breaks to urinate in a four-hour period; however, she first met Martin in April, 2011, nearly two years after her date last insured. (R. 39, 217-218). Similarly, in a "friend['s]" function report, dated nearly one-year after the plaintiff's date last insured, Sandra DeMattia, made only a cursory reference to the gas station "accident" (R. 146), and she submitted nothing new or additional that would suggest the plaintiff was experiencing a significant urinary frequency problem during the decisionally relevant time. (R. 139-149).

In summary, contrary to the plaintiff's contention on appeal, the ALJ did not rely on circular reasoning to discredit her testimony regarding functional limitations due to her need to urinate frequently. Instead, he concluded that Martin's urinary symptoms were not disabling, on the basis of the lack of relevant evidence in the treatment record during the period at issue, on the basis of her work activity during that time, and on the basis of the lack of supporting testimony relevant to the period at issue. Such a weighing of the evidence (or the lack thereof) and the

18

resolving of conflicts in the evidence is the duty of the ALJ.  *See Hays v. Sullivan*, 907 F.2$^d$ 1453, 1456 (4th Cir. 1990).  "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence."  *Id*.

## VI.    Proposed Findings

As supplemented by the above summary and analysis and on the basis of a careful and thorough examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1. The Commissioner's final decision is rational and in all material respects is supported by substantial evidence;

2. The ALJ appropriately considered Martin's testimony in assessing Martin's residual functional capacity;

3. The ALJ's credibility assessment was not based on circular reasoning;

4. The ALJ provided specific and adequate reasons for his credibility determination; he linked this determination to the evidence, and it is supported by substantial evidence;

5. The ALJ reasonably found Martin's urinary symptoms, either alone or in conjunction with her other symptoms, not to be of disabling severity;

6. The ALJ did not err in dismissing Martin's claimed back pain;

7. The ALJ's hypothetical questions to the vocational witness adequately reflected Martin's symptoms during the period at issue;

8. The ALJ did not err in relying on vocational testimony to support his finding that Martin could perform her past relevant work or other work that exists in significant numbers;

9. The ALJ did not err in failing to incorporate Martin's subjective allegations of disabling back pain,

10. The record does not support Martin's claim of "disabling pain" during the insured period;

11. All facets of the Commissioner's decision should be affirmed; and

12. It is RECOMMENDED that the plaintiff's motion for summary judgment be DENIED, the Commissioner's motion for summary judgment be GRANTED, an appropriate final judgment be entered AFFIRMING the Commissioner's decision denying benefits, and this matter DISMISSED from the court's active docket.

## VII. Directions to Clerk

The clerk is directed to transmit the record in this case immediately to the presiding United States district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

## VIII. Notice to the Parties

Both sides are reminded that pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the

conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

      **DATED:** This 22nd day of July 2013.

/s/ *James G. Welsh*

United States Magistrate Judge